HARRISON AND BURROWES BRIDGE CONSTRUCTORS, INC., and Laquidara, Inc., Plaintiff,

v.

Mario M. CUOMO, as Governor of the State of New York, and Franklin E. White, as Commissioner of the New York Department of Transportation, et al., Defendants.

No. 89–CV–447.

United States District Court,
N.D. New York.

Aug. 2, 1990.

Hayes & Hayes, Albany, N.Y., for plaintiff; Harry R. Hayes, III, of counsel.

Robert Abrams, Atty. Gen., State of N.Y., New York City, for defendants; Suzanne M. Lynn, Sanford M. Cohen, Robert Siegfried, Marla Tepper, Asst. Attys. Gen., of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

### I. Introduction

This is an action pursuant to 42 U.S.C. § 1983 in which the plaintiffs are challenging the constitutionality of two affirmative action programs administered by the State of New York with respect to certain highway construction projects. The plaintiff in the present motion for a preliminary injunction is Harrison and Burrowes Bridge Constructors, Inc. ("Harrison")—a corporation engaged almost entirely in the business of constructing and renovating bridges on New York State highway projects. Harrison seeks a preliminary injunction barring the State Department of Transportation ("State DOT") from enforcing these state and federal programs which act to pressure prime contractors to employ subcontractors that are owned and controlled by minorities and women.

The plaintiff has raised both a facial and as applied equal protection challenge to the State DOT's enforcement of the state and federal set-aside programs. The constitutionality of government-sponsored affirmative action programs has been hotly debated within the Supreme Court in four cases which have produced twenty-three separate opinions. See Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); Wygant v. Jackson Board of Education, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

On this issue the Court has spoken as a majority only in certain portions of Justice O'Connor's opinion in the *Croson* decision. These divergent and lengthy opinions make the task of lower federal courts faced with constitutional challenges to affirmative action programs all the more difficult.

This court held a hearing on May 9, 1989, at which time the parties engaged in oral argument—neither party desiring to present witnesses. The court denied the plaintiff's request for a temporary restraining order and held the preliminary injunction motion in abeyance pending the submission of further legal briefing and affidavits. Both parties to this motion have been permitted to make numerous post-hearing submissions.

The State of New York is to be lauded for its efforts to increase the opportunities of minority and women-owned businesses to participate in state funded contracts. However, as will be discussed below, the state has not put forward the evidentiary showing which is now required to find the state's affirmative action program constitutional. On the other hand, the court is not satisfied that the federal affirmative action program, as administered by the State DOT, is constitutionally suspect in a manner which would permit this court to issue a preliminary injunction barring the State DOT from administering the federal program. The following constitutes the court's findings of facts and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## II. The Challenged Programs and Conduct

The State DOT administers two programs which are aimed at increasing the level of participation of businesses which are owned and operated by women, minorities, and disadvantaged individuals on state and federally funded transportation construction contracts. Though styled as a § 1983 action, the plaintiff has challenged both programs—requiring this court to undertake a review of the federal legislation and regulations as they are administered by the State DOT.

### A. The Program Applicable to State Funded Projects

(i) *The Statute.* The New York State Legislature has enacted a comprehensive program designed to increase the participation of minority and women-owned business enterprises (termed "MBE's" and "WBE's") in contracts awarded by the State and its agencies; included within the scope of this program are state-funded construction contracts awarded by the Department of Transportation. *See generally,* Article 15–A of New York Executive Law, §§ 310–18; 1988 Session Laws, Ch. 261 § 63 ("Article 15–A"). The program, entitled "Participation by Minority Group Members and Women With Respect to State Contracts," became effective on July 19, 1988.[1] The provisions of Article 15–A supersede any prior enacted state law which was developed to increase the participation of women and minority-owned businesses in state contracts. N.Y.Exec.Law § 317. The state legislation does not apply to contracts on which a *federal* law concerning the participation of W/MBE's is applicable. *Id.* at § 313(3).

The centerpiece of Article 15–A is the establishment of the Governor's Office of Minority and Women's Business Development. N.Y.Exec.Law § 311. The director of this office, among other things, is required to "encourage and assist contracting [state] agencies in their efforts to increase participation by minority and women-owned business enterprises on state con-

---

1. The provisions of Article 15–A expire on December 31, 2003. 1988 Session Laws of New York, Ch. 261 § 121(h). However, section 311(3)(d) of Article 15–A requires a periodic review of the practices and procedures employed by contracting agencies when enforcing the statute. Any regulations concerning minority business enterprises and affirmative action which had previously been enacted by the DOT with respect to state funded contracts have no further applicability beyond September 1, 1988. Since the DOT construction contracts which are the subject of this suit were let in 1989, the DOT regulations promulgated at 17 N.Y.S.R.R. Part 35, and which were discussed extensively in the plaintiffs' memorandum of law, are not subject to review in this suit.

tracts and subcontracts so as to facilitate the award of a *fair share* of such contracts to them." *Id.* at § 311(3)(a) (emphasis added).[2] One of the duties of the director is to develop a directory of "certified minority and women-owned business enterprises" which are available to be solicited for state contract and subcontract work by either state agencies or general contractors. *See id.* at §§ 311(3)(f), 310(1), 314.[3] The director is required to issue rules and regulations which:

> [P]rovide measures and procedures to ensure that certified businesses shall be given the opportunity for meaningful participation in the performance of state contracts and to identify those state contracts for which certified businesses may best bid to actively and affirmatively promote and assist their participation in the performance of state contracts so as to facilitate the award of a fair share of state contracts to such businesses....

*Id.* at § 313(1). At no point does Article 15–A specify a quota or percentage set-aside of work on state contracts for M/WBE's. Rather, the statute employs less precise phrases such as "participation requirements," *id* at § 313(5), or "fair share," *id.* at § 313(1), to designate those portions of a particular state contract which are targeted for W/MBE's.

Article 15–A attempts to "encourage" contractors with state agencies to reach the designated W/MBE participation requirements by requiring contractors to submit a minority and women-owned business "utilization plan"[4] prior to the award of a state contract. *Id.* at § 313(4)(a).[5] The contracting agency must review the utilization plan, notify the contractor in writing of any deficiencies, and require that any deficiencies be remedied. *Id.* at § 313(4)(a). Failure on the part of a contractor to cure deficiencies may result in the revocation of the contract. However, the contractor has

---

2. A "minority-owned business enterprise" is defined at N.Y. Exec. Law § 310(7) as:

"[A] business enterprise, including a sole proprietorship, partnership or corporation that is:

(a) at least fifty-one percent owned by one or more minority group members;

(b) an enterprise in which such minority ownership is real, substantial and continuing;

(c) an enterprise in which minority ownership has and exercises the authority to control independently the day-to-day business decisions of the enterprise; and

(d) an enterprise authorized to do business in this state and independently owned and operated."

Nearly the same wording is used to define the term "women-owned business enterprise" except, of course, that the word "women" is substituted for the word "minority." *Id.* at § 310(15).

A "minority group member" is defined at N.Y. Exec. Law § 310(8) as:

"[A] United States citizen or permanent resident alien who is and can demonstrate membership in one of the following groups:

(a) Black persons having origins in any of the Black African racial groups;

(b) Hispanic persons of Mexican, Puerto Rican, Dominican, Cuban, Central or South American of either Indian or Hispanic origin, regardless of race;

(c) Native American or Alaskan native persons having origins in any of the original peoples of North America.

(d) Asian and Pacific Islander persons having origins in any of the Far East countries, South East Asia, the Indian subcontinent or the Pacific Islands."

3. The only statutory requirement necessary to qualify as a "certified" business, and thereby be included in the director's "statewide certification program" is simply that the business be "owned, operated and controlled by minority group members or women." N.Y. Exec. Law § 314(2). Nothing in the statute expressly states that certified businesses must include those which have suffered from the effects of prior discrimination. Nor does it appear that Article 15–A has a provision whereby a business enterprise's status as a "certified business" can be challenged by anyone but the state or its contracting agencies.

4. A "utilization plan" is defined in N.Y. Exec. Law § 310(9) as:

[A] plan prepared by a contractor and submitted in connection with a proposed state contract. The utilization plan shall identify certified minority and women-owned business enterprises, if known, that have committed to perform work in connection with the proposed state contract as well as any such enterprises, if known, which the contractor intends to use in connection with the contractor's performance of the proposed state contract.

5. It should be noted that a "state contract" for purposes of Article 15–A does not mean every contract with the State of New York or one of its agencies. In the case of the Department of Transportation it appears that Article 15–A is only applicable to contracts in excess of one hundred thousand dollars. *See* N.Y. Exec. Law § 310(13)(b).

a right to notification of the specific grounds for the revocation, an administrative appeal, and an appeal to the New York State Supreme Court, Appellate Division. *Id.* at §§ 313(4)(c).

The state statute also contains a provision whereby a contractor can apply for a complete or partial waiver of the W/MBE participation requirements on a state contract. The waiver may be granted if the contractor can show that it cannot, after making "good faith efforts," comply with the W/MBE participation goal. *Id.* at § 313(5). When deciding whether to grant the requested waiver the contracting agency must consider such things as: the number and type of MBE's and WBE's available to work in the region of the state where the contract is to be performed; the dollar value and scope of the contract; the ability of W/MBE's from outside the region to perform the work; the contractor's solicitation of WBE's and MBE's individually and through appropriate media; whether a WBE or MBE has responded to a bid solicitation in a timely and competitive manner; and whether the contractor has attempted to reorganize the contract work so as to increase the likelihood of W/MBE participation. *Id.* at § 313(5) and (6).

In the event that a waiver is denied for failure to comply with the participation requirements, both the contractor and contracting agency may file a complaint with the Director of the Governor's Office of Minority and Women's Business Development. *Id.* at § 313(7) and (8). Thereafter, the director is to attempt to resolve the problem and, if not resolved, refer the matter to arbitration for a report and recommendation. The statute permits the imposition of unspecified "sanctions, fines or penalties" against the contractor or a decision that no sanctions are appropriate. *Id.* at § 316. However, the assessment of any penalty against a contractor is subject to appeal pursuant to Article 78 of the New York Civil Practice Laws and Rules. *Id.* (ii) *The Regulations.* Pursuant to Article 15–A, the Director of the Governor's Office of Minority and Women's Business Development has filed "emergency" regulations with the New York Secretary of State.

The present regulations, which apply to the DOT, are codified at N.Y.Comp.Codes R. & Regs. tit. 9 §§ 540–544 (1990). These regulations generally expand upon the language contained in Article 15–A.

State agencies, such as the State DOT, which are covered by the regulations are required to submit to the Director of the Governor's Office of Minority and Women's Business Development an "agency goal plan" which sets the goal for the percentage of participation of MBE's and WBE's on contracts issued by the agency along with a justification for the goal. *Id.* at § 541.2(a). The director may accept, reject or modify the proposed agency goal plan. *Id.* at § 541.3. The contracting agencies must also establish a W/MBE participation goal for each individual contract. When setting the individual contract goals the agency is to take into account: (1) the scope of the work; (2) the number, type, and availability of WBE's and MBE's in the region of the state where the contract is to be performed; (3) the dollar value of the contract; (4) the percentage of minority group members and women in the population of the region where the contract will be performed; (5) the possible effects of past discrimination in reducing the participation of WBE's and MBE's in state contracts; and (6) the ability of other state agencies to meet their participation goals in a particular region of the state. *Id.* at § 543.2.

Prime contractors selected as the low bidder must submit a "utilization plan" specifying the WBE's and MBE's which the contractor intends to employ as subcontractors, the amount of money to be paid to the W/MBE's, and a description of the work that these subcontractors will perform. *Id.* at § 543.3. If the contractor is unable to meet the WBE/MBE participation requirements specified by the agency for the contract, the contractor must submit a request for a waiver. *Id.* at § 543.3(d). Should the contracting agency find the utilization plan insufficient it must provide the potential contractor with a notice of the deficiency within 20 calendar days from the date the plan was received; the contractor must re-

spond within seven business days. *Id.* at § 543.4.

Partial or total waivers from the W/MBE participation requirements may be granted by the contracting agency only upon the submission by the contractor of a written request which documents the "good faith efforts" made toward the achievement of the "goal requirements." *Id.* at § 543.7(a). The regulations do not specify exactly what constitutes a good faith effort on the part of a potential contractor. Instead, a non-exhaustive list of factors to be considered is set out in section 543.8 of the regulations. These factors, among other things, include: (1) whether a completed utilization plan was submitted; (2) whether bid solicitations were placed in general circulation, trade, and minority- and women-orientated publications; (3) whether appropriate WBE's and MBE's listed in the directory of certified businesses received written bid solicitations; (4) the extent to which WBE's and MBE's were available and responded to the bid solicitations in a timely and competitive manner; (5) efforts undertaken by the contractor to restructure the work to increase the likelihood of participation by minority- and women-owned businesses; and (6) whether information was provided to potential WBE's and MBE's which was sufficient to permit them to submit an informed and timely bid. *Id.*

When the contracting agency determines that the contractor has not documented good-faith efforts toward meeting the W/MBE participation goals the "contracting agency in its discretion may award the contract to the next lower responsible bidder, or to the next most technically qualified or otherwise acceptable proposer, notwithstanding that the disqualified bidder or proposer pursues any [available] remedies...." *Id.* at § 543.9(a). A disqualified contractor is entitled to an administrative hearing to review the agency's decision. *Id.* at § 543.9(b). Should the hearing officer find that the agency's decision was arbitrary or capricious then the officer

must direct a refund of the bid deposit. *Id.* at § 543.9(d). However, the hearing officer has no authority to direct the state agency to actually award the contract to the wrongfully disqualified contractor. *Id.* at § 543.9(e).[6] The hearing officer's decision may be appealed to the New York State Supreme Court, Appellate Division. *Id.* at § 543.9(g). The contracting agency also has the option of imposing a variety of lesser sanctions against a contractor who fails to meet the goal requirements. *Id.* at § 543.10.

The regulations also provide an opportunity for both the contractor and the contracting state agency to file complaints with the Director of the Governor's Office of Minority and Women's Business Development. *Id.* at § 543.12. It is not precisely clear what matters may be brought to the director's attention, but it appears that a contractor may request relief from an agency determination to deny a waiver from W/MBE goal requirements or to impose sanctions. *Id.* at § 543.12(e). Should the director be unable to resolve the complaint the matter may be referred to an arbitrator. The arbitrator makes a report to the director who may accept, reject, or modify the report but only to the extent that no sanction is increased. *Id.* at § 543.12(f). There is no language in the regulations which permits the director to require the agency to award a contract to a wrongfully disqualified contractor or allows for any sanctions to be awarded against the contracting agency. The director's decision may be appealed in accordance with Article 78 of the New York Civil Practice Law and Rules. *Id.*

## B. The Federal Program

In 1983, Congress enacted a five-year transportation authorization act entitled the Surface Transportation Assistance Act of 1982, Pub.L. No. 97–424, 96 Stat. 2097 ("STAA"). Section 105(f) of STAA states:

Except to the extent that the Secretary determines otherwise, *not less than 10*

---

6. Section 543.9(e) states that "[u]nder no circumstances shall such review and determination by such hearing officer interfere with the

determination of the State or contracting agency relative to its disposition of the particular contract which is the subject of review."

*per centum* of the amounts authorized to be appropriated under this Act shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals as defined by section 8(d) of the Small Business Act (15 U.S.C. section 637(d)) and relevant subcontracting regulations promulgated pursuant thereto.

To implement the set-aside provisions of STAA, the United States Department of Transportation ("Federal DOT") promulgated extensive regulations codified at 49 C.F.R. part 23, subpart D. New York Highway Law § 85 requires the State Commissioner of Transportation to comply with the Federal Aid Highway and Transportation Acts and regulations promulgated thereunder.

The current transportation authorization act, entitled the Surface Transportation and Uniform Relocation Assistance Act of 1987 ("STURAA"), also contains a provision which targets a portion of the federal funds for "disadvantaged business enterprises" ("DBE's"). Pub.L. No. 100–17, 101 Stat. 132. Section 106(c) of STURAA requires "not less than 10 percent of the amounts" appropriated under the Act to be "expended with small business concerns owned and controlled by socially and economically disadvantaged individuals." Section 106(c) continues to employ the definition of "socially and economically disadvantaged individuals" contained in the Small Business Act, with the exception that women are included as persons presumed to be disadvantaged individuals.

Section 106(c) of STURAA is modeled upon the DBE set-aside program contained in section 105(f) of STAA. The provisions of STAA were, in turn, modeled after section 103(f)(2) of the Public Works Employment Act of 1977 ("PWEA"), 42 U.S.C. § 6705(f)(2). *See* Senate Report (Environment and Public Works Committee) No. 100–4, 100th Cong., 1st Sess. (1987), U.S. Code Cong. & Admin. News Vol. 2 (1987) (Legislative History) page 76. The minority set-aside provision of PWEA, along with regulations promulgated thereunder, survived a facial equal protection challenge in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980).[7]

Disadvantaged businesses are small business concerns which are at least 51 percent owned by socially and economically disadvantaged individuals and whose management and daily business operations are controlled by one or more such individuals. Women and designated minority group members (e.g. Black Americans, Hispanic Americans, Native Americans, Asian–Pacific Americans, or Asian–Indian Americans) are rebuttably presumed to be socially and economically disadvantaged. *See* 15 U.S.C. § 637(d)(3)(C) (Definitional section of Small Business Act incorporated into STURAA); *see also* 49 C.F.R. § 23.62 (regulation promulgated by Department of Transportation which implements section 106(c) of STURAA). However, other individuals who are not listed as presumptively disadvantaged may also be designated as disadvantaged on a case-by-case basis. Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities. Economically disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged. *See* 49 C.F.R. § 23.62 (incorporating definitional language found in 15 U.S.C. § 637(a)(5), (6)).

---

**7.** Section 103(f)(2) of PWEA states:

Except to the extent that the Secretary determines otherwise, no grant shall be made under this Act for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term "minority business enterprise" means a business at least 50 per centum of which is owned by minority group members or, in case of a publicly owned business, at least 51 percentum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts.

Recipients of federal highway funds under STURAA, such as the New York State Department of Transportation, are required to establish overall goals for the use of disadvantaged businesses on construction contracts funded with federal monies. 49 C.F.R. §§ 23.64(a), 23.45(g). Unless the recipient receives a waiver from the Secretary, it must expend at least 10% of these funds with small businesses which are owned and controlled by disadvantaged individuals. *Id.* at § 23.66(a). The recipients and the Federal Highway Administration may, however, set a higher goal. *Id.* at § 23.64(d); *see* H.Conf.Rep. No 100-17 100th Cong., 1st Sess. (Joint Explanatory Statement of the Committee of Conference) (1987), *reprinted in* U.S.Code Cong. & Admin. News Vol. 2 (1987) (Legislative History) page 132. The regulations also require recipients to set goals for the participation of disadvantaged businesses on *each individual* prime contract funded by STURAA. *Id.* at § 23.45(g)(2)(ii). These participation goals are to be "practical and related to the potential availability of [disadvantaged businesses] in desired areas of expertise." *Id.* at § 23.45(g)(1).

Individual contractors must satisfy the disadvantaged business participation requirements or show "good faith efforts" toward meeting the goals in order to be awarded the STURAA-funded contract. *Id.* at § 23.45(h).[8] A recipient may be found to be in noncompliance with STURAA should it fail to obtain approval of its overall goal by the Department of Transportation or fail to meet an approved goal without providing appropriate justification. *Id.* at § 23.68(a), (b), (c), and (d). A recipient who fails to meet its overall goal, due to the failure of prime contractors to meet their individual goals, is not excused unless the contractor made good faith efforts to comply. 49 C.F.R. Part 23, Appendix A (discussion of section 23.68). Failure to comply with the regulations may result in the withholding of STURAA funds from the recipient in whole or in part. *See* 49 C.F.R. § 23.68(e)(1); 23 C.F.R. § 1.36.

### C. The New York DOT's Contract Letting Process

The New York State Department of Transportation administers the federal DBE program and the state W/MBE program in a similar fashion. According to the defendants, the State DOT abides by all applicable laws and regulations when administering these programs. *See* May 3, 1989, Affid. of Flowers par. 5; May 3, 1989, Affid. of Harp *passim.*

Pursuant to 49 CFR § 23.64(d) (incorporating the requirements of § 23.45(g)) the New York DOT submitted, and the Federal Highway Administration approved, a disadvantaged business participation goal of 17% for fiscal year 1989. May 3, 1989, Affid. of Harp, at par. 15; May 3, 1989, Affid. of Flowers, Exhibit A. According to the defendants, the current overall DBE goal was calculated after considering the availability of DBE's, the level of DBE participation achieved in the previous year, and the type of work to be performed in the coming fiscal year. May 3, 1989, Affid. of Flowers par. 8 and Exhibit A.

The DBE participation goals for individual contracts with subcontracting possibilities are generally set by reference to a DOT-developed table which designates goals depending on the dollar amount of the contract, the location within the state of the work to be performed, and the type of work to be performed. *See* Plaintiffs' Supporting Exhibits, Exhibit G. Defendants contend that the table is based upon considerations of the availability of DBE's

---

**8.** Appendix A to § 23.45 provides a non-exhaustive list of factors which may be taken into account by a recipient when determining whether an individual prime contractor has made good faith efforts to achieve the participation goal. These factors include: whether the contractor attended a pre-bid conference designed to inform disadvantaged businesses of subcontracting opportunities; whether the contractor solicited bids through advertisements or through individual notices to disadvantaged businesses; and the extent to which the contractor pursued bids by disadvantaged businesses by following up on potential participants, providing information necessary to make an informed bid, negotiating in good faith, or redesigning the scope of the work to be performed to increase the likelihood that a disadvantaged business would participate.

and the recent success or failure of efforts to obtain DBE participation in a particular area of the state. May 3, 1989, Affid. of Flowers par. 9. An identical overall participation goal of 17% has been set by the State DOT for state-funded construction contracts. The same table is used to set individual contract goals on both state and federal projects.[9] Defendants assert that D/W/MBE participation goals for both the state and federal programs are re-examined annually. May 3, 1989, Affid. of Flowers par. 10; *see* 49 CFR § 23.45(g); N.Y. Exec.Law § 313; N.Y.Comp.Codes R. & Regs. tit. 9 § 541.3. The Contract Review Unit ("CRU") of the State DOT is initially responsible for determining whether a low bidder on a contract is "responsible" and therefore entitled to be awarded the contract.[10] The low bidder's compliance with federal DBE and state W/MBE participation goals is one factor which the Contract Review Unit takes into account when deciding whether the low bidder is the lowest responsible bidder. *See* May 3, 1988, Affid. of Harp pars. 25–28. When the CRU finds that a low bidder has not complied with the participation requirements, it notifies the low bidder of the perceived deficiencies, provides some information on how the low bidder can be brought into compliance, and permits the low bidder to appear before it, with counsel, to discuss the relevant issues. This "discussion" effectively serves as an informal hearing. In the notice, the low bidder is also warned that failure to comply with the D/W/MBE requirements without making a showing of good faith will likely result in the contract being awarded to the next low bidder found to be responsible. *See* May 3, 1989, Affid. of Flowers, par. 21 and Exhibit E; Plaintiffs' Supporting Affidavits, Exhibit F. On State contracts the DOT is also required to cause the forfeiture of the low bidder's bid bond when a showing of good faith is not made. Highway Law § 38(2).[11] Defendants assert that the flexibility of the program is demonstrated by the fact that of the $755 million in contracts let by the DOT from April 1, 1988, to March 31, 1989, nearly $255 million were on contracts where the contractor failed to achieve the

---

**9.** According to Horace Flowers, Director of the New York State Department of Transportation's Office of Equal Opportunity Development and Compliance, there are many instances where the State DOT sets no DBE participation goals. This usually occurs in situations where the contract is for emergency work or the work does not appear to contain subcontracting opportunities. Between April of 1988 and March of 1989 the DOT let approximately 411 contracts, of which 75 had no participation goals. May 3, 1989, Affid. of Flowers, par. 11.

**10.** N.Y. Highway Law § 38 provides that:

State highways shall be constructed or improved by contract. Upon the completion and final adoption or approval, *as provided by law,* of the plans and specifications for the construction or improvement of a state highway, contracts therefor shall be executed as provided herein.

The statute further provides that:

The contract for the construction or improvement of such highway or section thereof shall be awarded to the *lowest responsible bidder,* as will best promote the public interest. *Id.* at § 38(3).

The commissioner of transportation may reject any or all proposals and may advertise for new proposals as provided in this section, if, in his opinion, the best interests of the state will thereby be promoted.

*Id.* at § 38(4). Article 15–A of the New York Executive Law and the regulations promulgated thereunder provide the authority for the State DOT to administer the state W/MBE program, while section 106(c) of STURAA and the regulations promulgated at 49 CFR §§ 23.45(g)(2)(ii), (g)(7), (h) provide the authority for the State DOT to administer the federal program.

**11.** The plaintiff makes a number of accusations to the effect that the Contract Review Unit threatens low bidders with suspension or debarment from participation in future state contracts should they fail to comply with WBE/MBE participation requirements. The defendants admit that the DOT, at one time, did engage in the practice of prospectively suspending or debarring prime contractors for failing to complete a bid. However, the defendants insist that this practice ended in 1986 with the decision of *Callanan Industries, Inc. v. White,* which held that the DOT had no legislative authority to prospectively suspend a prime contractor for failing to comply with the Department's affirmative action program. 118 A.D.2d 167, 503 N.Y. S.2d 930, 933, *modification denied* 123 A.D.2d 462, 506 N.Y.S.2d 287, *appeal denied* 69 N.Y.2d 601, 511 N.Y.S.2d 1027, 503 N.E.2d 695 (1986). For purposes of this motion for a preliminary injunction this court finds that the DOT does not currently engage in the practice of suspending or debarring irresponsible prime contractors. *See* May 3, 1989, Affid. of Harp at 35.

D/W/MBE participation requirements, yet made a satisfactory showing of good faith efforts.

### D. Facts Specific to Plaintiff Harrison

The plaintiff is a New York corporation which is engaged almost exclusively in the business of constructing and rehabilitating bridges as a prime contractor on projects let by the New York Department of Transportation. The plaintiff corporation is owned and operated by white males. It is not disputed that the plaintiff is ineligible to be certified as a minority- or women-owned business under New York's W/MBE program or as a DBE under the federal set-aside program. Plaintiff has consistently bid on State DOT construction contracts and intends to do so in the future.

At the time this motion was originally filed, plaintiff Harrison claimed that it had submitted the low bid on six DOT construction contracts since January 1, 1989. At that time, plaintiff had been awarded two of the contracts while the DOT had yet to make a final determination on the award of the four remaining contracts. April 18, 1989, Affid. of DiStefano pars. 3-4. Plaintiff maintained that awards had not been made on the four outstanding contracts because it had failed to comply with the applicable D/W/MBE participation goals. Plaintiff was the low bidder on the following projects:

| PROJECT | LETTING DATE | BID AMOUNT | FUNDING SOURCE |
|---------|--------------|------------|----------------|
| D252654 | 1–12–89 | $ 524,680.24 | State |
| D252655 | 1–12–89 | 739,739.39 | State |
| D252678 | 2–23–89 | 434,434.43 | State |
| D252729 | 3–23–89 | 249,249.49 | State |
| D500812 | 3–30–89 | 1,173,117.31 | Federal |
| D252753 | 4–13–89 | 306,306.36 | State |

*See* April 17, 1989, Affid. of DiStefano par. 3 and Exhibit M. Since this motion was originally filed the State DOT has made final determinations on all six contracts. The D/W/MBE goal and final disposition of each contract was:

| PROJECT | DBE/MBE GOAL | WBE GOAL | Disposition |
|---------|--------------|----------|-------------|
| D252654 | 8% | 2% | H & B Awarded |
| D252655 | 8% | 2% | H & B Awarded |
| D252678 | 6% | 2% | H & B Awarded |
| D252729 | 6% | 2% | All Bids Rejected |
| D500812 | 12% | 2% | Denied/Other Awarded |
| D252753 | 6% | 2% | H & B Awarded |

*See* May 3, 1989, Affid. of Harp, pars. 36–38; July 6, 1989, Affid. of Harp; August 22, 1989, Affid. of Harp; December 12, 1989, Affid. of Harp, par 1.

There are no *state*-funded contracts on which plaintiff was ultimately denied the award due to its failure to comply with the State W/MBE participation requirements. Plaintiff was awarded four of the state-funded contracts. A fifth project, D252729, was withdrawn by the State DOT—all bids being rejected. The plaintiff's low bid on the *federally* funded contract, project D500812, was rejected by the Contract Review Unit on the basis that plaintiff neither met the federal DBE participation requirements nor demonstrated good faith efforts toward achieving those goals. *See* July 6, 1989, Affid. of Harp, par. 6 and Exhibit C.

It is undisputed that the plaintiff Harrison received warning letters from the State

DOT concerning the state-funded contracts D252654, D252655 and D252678. *See* April 17, 1989, Affid. of DiStefano, Exhibit N. These letters informed the plaintiff that it was the low bidder, that it had failed to fulfill the W/MBE requirements contained in the contract specifications, and provided information on how the plaintiff could either comply with the W/MBE requirements or make the requisite good faith efforts toward achieving those goals. Moreover, the letters provided the plaintiff with a date upon which the State DOT's Contract Review Unit would meet to make a final determination as to whether the plaintiff had complied with the W/MBE goals. Plaintiff was notified that it could send a representative to the meeting and that it may be represented by counsel. The letter stated that failure to comply with the W/MBE requirements could result in the contract being awarded to the next "responsible" low bidder and the forfeiture of the bid bond or deposit. The State DOT sent copies of the warning letters to the plaintiff's bonding company. *Id.* at par. 8. There is nothing in the litigation papers which informs the court whether the Contract Review Unit actually held a hearing. In any event, all three contracts were ultimately awarded to the plaintiff.

Plaintiff Harrison was also the low bidder on projects D252729 and D500812. The Contract Review Unit issued warning letters and summoned plaintiff to a meeting on May 18, 1989, for the purpose of determining whether the State DOT would reject the low bids for failure to comply with the D/W/MBE participation requirements. June 19, 1989, Affid. of Hayse par. 4. All bids were ultimately rejected on project D252729. December 12, 1988, Affid. of Harp, pars. 1–3. The plaintiff's low bid on D500812 was rejected for failure to meet

the federal DBE requirements; the contract was awarded to the next low bidder. June 19, 1989, Affid. of Hayse par. 5 and Exhibit A. On June 16, 1989, the Contract Review Unit held a meeting to determine whether the plaintiff had complied with the W/MBE requirements on project D252753. *Id.* at par. 6. As noted above, the contract was ultimately awarded to the plaintiff.

Plaintiff asserts that the time and expense of attempting to fulfill the D/W/MBE requirements, responding to warnings, filling out the required forms and attending Contract Review Unit meetings is substantial. Plaintiff claims to have lost money when it subcontracted out portions of contracts to D/W/MBE's which it would normally perform itself. April 17, 1989, Affid. of DiStefano, par. 13.

## III. Legal Background
### Race–Conscious Affirmative Action Programs

The Supreme Court decisions which bear most directly on the constitutionality of race-conscious affirmative action programs presently before this court are *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) and *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980).

### A. Croson—State Programs

In *City of Richmond v. J.A. Croson Co.* the Supreme Court struck down, on Fourteenth Amendment equal protection grounds, a program instituted by the City of Richmond, Virginia, which reserved thirty percent (30%) of all public contracting work for minority-owned business enterprises ("MBEs").[12] MBEs were defined as businesses which were 51% owned and con-

---

**12.** Lower federal courts, when analyzing decisions of a fragmented Supreme Court in which no single decisional rationale has gained the approval of five Justices, must view the Court's holding " 'as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976)). Large portions of Justice

O'Connor's opinion in *Croson* obtained a majority of the Court. Of course, those portions of the decision where Justice O'Connor spoke for a majority must be followed by this court. Moreover, this court will generally follow Justice O'Connor's decision when speaking for a plurality of the Court because her decision best fulfills the criteria of constituting the "position taken by those Members who concurred in the judgments on the narrowest grounds."

trolled by "minority group members," that is, U.S. citizens who are Black, Spanish-speaking, Orientals, Indians, Eskimos, or Aleuts. The minority set-aside ordinance described the program as "remedial" and was limited in duration to a period of five years. Prime contractors could obtain waivers of the 30% set-aside in narrow circumstances where the program director was satisfied that the set-aside requirements could not be achieved. The program did not provide for a direct right to appeal the denial of a waiver but there was a general right of protest available to contractors under Richmond's procurement policies. *Id.* 109 S.Ct. at 712–13.

The *Croson* court examined in detail the evidence upon which the Richmond City Council relied when enacting the minority set-aside program. While the population of Richmond was 50% black, only .67% of all prime contracts had been awarded to minority-owned contractors over the previous five-year period. Local contractor associations had virtually no minority business members. Moreover, testimony was placed on the record asserting that the construction industry excluded persons on account of race. Justice O'Connor determined, however, that the record contained "no direct evidence of race discrimination on the part of the city in letting contracts or any evidence that the city's prime contractors had discriminated against minority-owned subcontractors." *Id.* at 714.

The plaintiff in *Croson* was a plumbing contractor who had submitted the sole bid for a contract to install plumbing fixtures in the city jail. The plaintiff tried to comply with the city ordinance by attempting to purchase the fixtures specified for the project from an MBE. Only one MBE submitted an estimate to the plaintiff. This estimate, however, was late—submitted after the date the bids were unsealed—and high—priced 7% over the actual market value for the fixtures. *Id.* at 715. The plaintiff's request for a waiver from the set-aside requirements was denied without an opportunity to appeal. The city instead decided to rebid the project. At this point the plaintiff initiated a suit pursuant to 42 U.S.C. § 1983 alleging that the city ordinance was unconstitutional both on its face and as applied. *Id.* at 716.

In part III–A of her decision in *Croson,* which was joined by three other members of the Court, Justice O'Connor held that "strict scrutiny"[13] was the standard of judicial review to be applied to the Richmond plan because the plan "denies certain citizens the opportunity to compete for a fixed percentage of the public contracts based solely on race." *Id.* at 721. Though a precise definition of the strict scrutiny standard is elusive, this standard, when applicable, generally requires the governmental action to be supported by a compelling interest with the means chosen narrowly tailored to achieve the government's goal. *See e.g., Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 273–74, 106 S.Ct. 1842, 1846–47, 90 L.Ed.2d 260 (1986).

(i) *Compelling Interest—Factual Predicate Needed to Justify Race–Conscious Legislation.*

Part III–B of Justice O'Connor's decision was joined by a majority of the Court. This portion of the decision discussed the "factual predicate" that a state or local

---

**13.** Justice O'Connor stated that the application of the strict scrutiny standard is not dependent on the race of those "burdened or benefited." *Croson,* 109 S.Ct. at 721. The basis for this view was that such racial classifications (1) carry a danger of stigmatic harm, (2) may promote notions of racial inferiority, (3) lead to racial hostility, and (4) are generally unnecessary in light of the power of state and local governments to punish and prevent discrimination, remove barriers to minority advancement, and fashion race-neutral programs to achieve the same goals. *Id.* The application of strict scrutiny, according to Justice O'Connor, is necessary to:

"smoke out" illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen "fit" this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.

*Id.* Justice O'Connor held that strict scrutiny was particularly appropriate in a situation where, as here, 50% of the city's population was black and five of the nine seats on the city council were held by blacks. In short, an ethnic majority was conferring a benefit upon itself. *Id.* at 722.

government must provide in order to show the compelling governmental interest necessary to support the enactment of race-conscious legislation. The Court held that:

> While the States and their subdivisions may take remedial action when they possess evidence that their own spending practices are exacerbating a pattern of prior discrimination, they must identify that discrimination, public or private, with some specificity before they may use race-conscious relief.

*Id.* 109 S.Ct. at 727 (emphasis added). The *Croson* Court specifically rejected the argument that the state or locality must limit any race-based remedial efforts to eradicating the effects of its *own* prior discrimination—stating that this "stark" position cannot "withstand analysis." *Id.* at 706. Rather, the Court held that a state or locality may enact race-conscious remedial legislation (1) to cure its own prior discrimination or (2) when it had been a "passive participant" in private discrimination due to its financing of a "system of racial exclusion practiced by elements of the construction industry." *Id.* at 720, 727. It was further explained that a state or local government must provide a " 'strong basis in evidence for its conclusion that remedial action was necessary;' " this 'strong basis' must "approach a prima facie case of a constitutional or statutory violation" by persons involved in a particular industry. *Id.* at 724.

The Court outlined in detail the type of information which was *not* sufficient to support the enactment of race-conscious legislation. First, "a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Id.* at 723. Therefore, general statements made before the Richmond City Council, which asserted that there had been past discrimination in the construction industry, were of little effect. Moreover, the "mere recitation of a 'benign' or legitimate purpose for a racial classification, is entitled to little or no weight." *Id.* Thus, the City Council's designation of the minority set-aside program as "remedial" was considered to be of slight value in demonstrating a compelling interest for the program.

The fact that minorities received only .67% of the prime contracts while minorities comprised 50% of the city's population was not accepted by the Court as evidence of past discrimination. Although the Court noted that for "certain entry level positions or positions requiring minimal training, statistical comparisons of the racial composition of an employer's workforce to the racial composition of the relevant population may be probative of a pattern of discrimination," *Id.* at 725, the Court held that where "special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task." *Id.* As is evident from the *Croson* decision, construction contractors and subcontractors are considered to be a part of a narrower statistical pool of persons with "special qualifications."

The *Croson* Court dismissed the city's contention that low MBE membership in local contractor's associations was evidence of discriminatory conduct in the construction industry. "The mere fact that black membership in these trade organizations is low, standing alone, cannot establish a prima facie case of discrimination." *Id.* at 726. However, the city could show a compelling interest sufficient to support race-conscious legislation "[i]f the statistical disparity between *eligible* MBEs and MBE membership [in trade associations] [was] great enough [to support] an inference of discriminatory exclusion." *Id.* (Emphasis in original).

The *Croson* Court also cited Richmond's failure, to develop information concerning (1) the number of MBEs available to undertake public contracting work, (2) the percentage of city construction dollars which actually go to minority firms, and (3) the number of violations of Richmond's anti-discrimination laws by construction contractors, as further support for its holding that the minority set-aside program was initiated on an insufficient factual predicate. *Id.* at 725–26, and n. 3. Moreover,

Congressional findings of nation-wide discrimination in the construction industry was held to be of limited probative value in demonstrating the existence of discrimination locally, *id.* at 726, and that the existence of discrimination in one area may not be "extrapolated" from discrimination which is found to exist in another location. *Id.* at 727. Finally, the *Croson* Court took note of the fact that there was *"absolutely no evidence* of past discrimination against Spanish-speaking, Oriental, Indian, Eskimo, or Aleut persons in the Richmond construction industry." *Id.* at 727–28 (emphasis in original). This "gross overinclusiveness" was found to "strongly impugn[ ] the city's claim of remedial motivation." *Id.* at 728.

### (ii) *Narrow Tailoring of Program to Remedy Prior Discrimination.*

After holding that the City of Richmond failed to provide a factual predicate sufficient to show a compelling governmental interest, a majority of the Court, in part IV of the decision, made some "observations" concerning the need to narrowly tailor race-conscious legislation which is designed to remedy discrimination. *Id.* at 728. The court first emphasized the need to consider "race-neutral means" to increase minority business involvement in public contracting. The Court noted that in *Fullilove* the Congress had "carefully examined and rejected race-neutral alternatives before enacting the MBE set aside." Secondly, the Court appeared to be highly suspicious of the "rigid" 30% MBE quota which had been adopted by the City of Richmond. More appropriate to narrow tailoring were programs which considered waivers on a case-by-case basis, took into account whether a particular MBE charged excessively high prices, and investigated to determine whether a particular MBE had actually suffered from the effects of past discrimination. *Id.* at 728–29.

The *Croson* Court did not, however, completely foreclose the possibility of race-conscious remedial relief. The Court stated:

If the city of Richmond had evidence before it that non-minority contractors were systematically excluding minority businesses from subcontracting opportunities it could take action to end the discriminatory exclusion. Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise.... Under such circumstances, the city could act to dismantle the closed business system by taking appropriate measures against those who discriminate.... *In the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion.*

*Id.* at 729 (emphasis added). From the language of *Croson* it is clear that a state or locality which has enacted a race-conscious remedial program must bear a very heavy burden to survive an equal protection challenge.

### B. Fullilove—Federal Programs

In *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), the Court upheld a minority set-aside program which was contained in § 103(f)(2) of the Public Works Employment Act of 1977, Pub.L 95–28, 91 Stat. 116, 42 U.S.C. § 6705(f)(2).[14] The suit was a facial challenge to the program pursuant to the equal protection component of the Due Process Clause of the Fifth Amendment. The Act, which allocated four billion dollars to states and localities for public works projects, contained a requirement that: "Except to the extent the Secretary determines otherwise, no grant shall be made under this Act

---

**14.** No judicial opinion obtained a majority in *Fullilove.* The plurality decision of Chief Justice Burger and the concurrence of Justice Powell, however, followed a middle path between the divergent opinions of a fragmented Court. Therefore, pursuant to *Marks v. United States,* this court is bound to follow the opinions of

Justices Burger and Powell. Chief Justice Burger's opinion was joined by Justices White and Powell. Justice Powell wrote a lengthy concurring opinion. Justice Marshall filed an opinion concurring in the judgment in which Justices Blackmun and Brennan joined. The dissenting justices were Rehnquist, Stewart, and Stevens.

... unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises." *Fullilove*, 448 U.S. at 454, 100 S.Ct at 2762 (quoting 91 Stat. 116, 42 U.S.C. § 6705(f)(2)). Minority business enterprises were defined as businesses operated and controlled by "citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts." *Id.*

The principal opinion in *Fullilove* was written by Chief Justice Burger who, as an initial matter, held that Congress had the authority to enact the minority set-aside legislation pursuant to the commerce clause and section 5 of the Fourteenth Amendment. *Id.* at 475–76, 100 S.Ct. at 2773–74. Next, the Chief Justice addressed the issue of whether the race conscious legislation went beyond the constraints established by the Equal Protection Clause. While the Chief Justice determined that the program must be subject to "close examination," *id.* at 472, 100 S.Ct. at 2271, he did not state whether strict scruti-

ny was the applicable standard of review.[15] Rather, in upholding the program, the opinion emphasized (1) the "unique" remedial authority of Congress pursuant to § 5 of the Fourteenth Amendment[16], (2) the "abundant" evidence before Congress of past discrimination in the construction industry . which reduced minority participation in the federal construction programs, *id.* at 458–67, 100 S.Ct. at 2764–69,[17] and (3) the process whereby a waiver could be sought from the set-aside's requirements where minority businesses were not available to fill the 10% requirement or where the MBE exploited the program by charging an unreasonable price. *Id.* at 487–88, 100 S.Ct. at 2779–80.[18]

## C. Croson's Effect on Fullilove

The *Croson* decision does not detract from *Fullilove's* holding that properly enacted federal minority set-aside programs are a valid exercise of a "unique" federal authority—an authority which, in Justice's O'Connor's view, does not reside with the states. In part two of her decision in *Cro-*

**15.** The Chief Justice also stated that there was a "need for careful judicial evaluation to assure that any congressional program that employs racial or ethnic criteria to accomplish the objective of remedying the present effects of past discrimination is narrowly tailored to the achievement of that goal." *Fullilove*, 448 U.S. at 480, 100 S.Ct. at 2775–76.

**16.** Chief Justice Burger stated that a congressional program which "employs racial or ethnic criteria, even in a remedial context, calls for close examination; yet we are bound to approach our task with appropriate deference to the Congress, a co-equal branch charged by the Constitution with the power to 'provide for the ... general Welfare of the United States' and 'to enforce, by appropriate legislation,' the equal protection guarantees of the Fourteenth Amendment." *Fullilove*, at 472, 100 S.Ct. at 2271. Later in the decision the Chief Justice stated: "It is fundamental that in no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees." *Id.* at 483, 100 S.Ct. at 2777. On this basis Chief Justice Burger concluded that "Congress not only may induce voluntary action to assure compliance with existing federal statutory or constitutional antidiscrimination provisions, but also, where Con-

gress has authority to declare certain conduct unlawful, it may as here, authorize and induce state action to avoid such conduct." *Id.* at 483–84, 100 S.Ct. at 2777. Justice Powell, in his concurrence, indicated that Congressionally enacted minority set-aside programs would receive special deference when he noted that such programs, when instituted by other governmental entities, would likely be subject to a more thorough scrutiny of the basis for the program and greater limitations on the choice of remedies available to correct past discrimination. *Id.* at 515–16, n. 14, 100 S.Ct. at 2794, n. 14.

**17.** After this extensive consideration of congressional and administrative reports concerning the present effects of past discrimination on MBE participation in government contracts, the Court stated that it was "inconceivable that Members of both Houses were not fully aware of the objectives of the MBE provision and the reasons prompting its enactment." *Fullilove*, 448 U.S. at 467, 100 S.Ct. at 2769.

**18.** Justice Burger's decision also undertook a detailed review of the regulations which implemented the congressionally authorized minority set-aside program. *Fullilove*, 448 U.S. at 468–72, 100 S.Ct. at 2769–71. The Chief Justice found that the "administrative approach [was] consistent with the legislative intention." *Id.* at 471, 100 S.Ct. at 2771.

*son,* a portion which was joined only by two other members of the Court,[19] Justice O'Connor drew a strong distinction between the authority of states and localities to enact race-conscious remedial legislation as compared to the authority of the Congress. Justice O'Connor emphasized that " '§ 5 is a *positive* grant of legislative power authorizing *Congress* to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment.' " 109 S.Ct. at 719 (quoting *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 1723, 16 L.Ed.2d 828) (emphasis added). This grant of authority to Congress to "identify and redress the effects of society-wide discrimination" does not extend to "States and their political subdivisions." *Id.* 109 S.Ct. at 719. In the view of the *Croson* plurality, while Section 5 of the Fourteenth Amendment expanded Congressional powers:

> Section 1 of the Fourteenth Amendment is an explicit *constraint* on state power, and the States must undertake any remedial efforts in accordance with that provision. To hold otherwise would be to cede control over the content of the Equal Protection Clause to the 50 state legislatures and their myriad political subdivisions. The mere recitation of a benign or compensatory purpose for the use of a racial classification would essentially entitle the States to exercise the full power of Congress under § 5 of the Fourteenth Amendment and insulate any racial classification from judicial scrutiny under § 1. We believe that such a result would be contrary to the intentions of the Framers of the Fourteenth Amendment, who desired to place clear limits on the States' use of race as a criterion for legislative action, and to have the federal courts enforce those limitations.

*Id.* Nothing in *Croson* detracts from the continued validity of *Fullilove.* This is evident from the *Croson* Court's extensive reliance on *Fullilove* as well as the efforts taken in *Croson* to distinguish the standard of review applied to state, as opposed to federal, minority set-aside programs. *Croson,* 109 S.Ct. at 717–20, 726–30, 719 ("our treatment of an exercise of congressional power in *Fullilove* cannot be dispositive here"). Therefore, this court must conclude that *Fullilove* still sets the standard of judicial review of affirmative action programs which have received the approval of Congress.

### Gender Conscious Affirmative Action Programs

The *Croson* and *Fullilove* decision dealt solely with classifications based on race or ethnicity. The state and federal programs challenged in the present suit contain gender-conscious classifications in addition to classifications based on race. The *Croson* Court commented only briefly on gender-conscious set-aside programs, stating that the Court has engaged in a "close examination of the legislative purpose ... when reviewing classifications based on either race or gender." *Croson,* 109 S.Ct. at 721–22 (citing *Weinberger v. Wiesenfeld,* 420 U.S. 636, 648, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514 (1975)).

The Supreme Court has generally applied an intermediate level of scrutiny when reviewing an equal protection challenge to governmental programs which classify persons on the basis of gender. *See generally, Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Moreover, whether the "statutory policy discriminates against males rather than against females does not exempt it from scrutiny or reduce the standard of review." *Mississippi University for Women v. Hogan,* 458 U.S. 718, 723, 102 S.Ct. 3331, 3335–36, 73 L.Ed.2d 1090 (1982). The intermediate standard as it applies to gender-based classification places a burden on the party seeking to uphold the statute to demonstrate that "the classification serves 'important governmental objectives and

---

**19.** Though only a plurality, this court holds that section II of Justice O'Connor's decision in *Croson* should be followed because it distinguishes rather than detracts from the central holding of *Fullilove.* It is the opinion which is based on the narrowest grounds—working a central path between the decisions of a fragmented Court.

that the discriminatory means employed' are 'substantially related to the achievement of those objectives.' " *Id.* at 724, 102 S.Ct. at 3336 (quoting *Wengler v. Druggists Mutual Ins. Co.,* 446 U.S. 142, 150, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980)).

With respect to the general issue of affirmative action programs which attempt to compensate women for discrimination, the Court in *Mississippi University* stated:

> In limited circumstances, a gender based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened.... However, we consistently have emphasized that "the mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." ... The same searching analysis must be made, regardless of whether the State's objective is to eliminate family controversy, ... to achieve administrative efficiency, ... or to balance the burdens born by males and females.... It is readily apparent that a State can evoke a compensatory purpose to justify an otherwise discriminatory classification only if members of the gender benefited by the classification actually suffer a disadvantage related to the classification."

458 U.S. at 728, 102 S.Ct. at 3338 (citations omitted).

In *Associated General Contractors of California v. City & County of San Francisco,* 813 F.2d 922 (9th Cir.1987), the Ninth Circuit upheld that portion of a city program which provided women-owned businesses with a preference in the award of municipal contracts, while at the same time striking down the portion of the program which provided minority-owned businesses with similar preferences. The court first noted that an "exceedingly persuasive justification" was required to support governmental classifications based on gender. *Id.* at 940 (citing *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982); *Kirchberg v. Feenstra,* 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed.2d 428 (1981); *Personnel Admin. of Mass. v. Feeney,* 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979)). While the court found that assisting women to overcome the effects of discrimination was sufficient to support the use of gender-based classifications, it also noted that the mere recitation of a benign purpose is not enough to support such a classification. The court also emphasized that the gender-based preference could not operate to "reinforce archaic and stereotyped notions of the roles and abilities of women," *Id.* (citing *Weinberger v. Wiesenfeld,* 420 U.S. 636, 648, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514 (1975)), and that the gender-based program must employ means which are "substantially related to [the] achievement" of the goal. *Id.* at 941 (citing *Wengler v. Druggist Mut. Ins. Co.,* 446 U.S. 142, 150, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980).

The court held that the city satisfied the first prong of the test because it enacted the legislation to remedy disparate treatment of women in the business community and to assist women in overcoming disadvantage caused by the city's own contracting practices. *Id.* at 941. The court was concerned, however, by the fact that the San Francisco ordinance applied to a large number of businesses and professions—expressing the opinion that the program may well be overinclusive. According to the court, there was no reason to believe that women were disadvantaged in all the areas in which the city contracted. *Id.* However, the court held that there was sufficient evidence of broad discrimination against women for the program to survive a facial challenge—waiting until another day to contemplate the constitutionality of a WBE preference within a particular industry. *Id.* at 942.

In *Main Line Paving v. Board of Educ.,* 725 F.Supp. 1349, 1362–64 (E.D.Pa.1989), the court, employing intermediate scrutiny, struck down a gender-based set aside program. The court held that the Board of Education's goal of eliminating past discrimination against women in the field of construction contracting was an "important objective." *Id.* at 1363. After reviewing

the record, however, the court found "scant evidence that the [set-aside policy] is fairly and substantially related" to the important objective. *Id.* ("[T]he only mention of women [in the record] is the fact that there were very few contracts awarded to them. The [record] contains nothing to detail the cause of this disparity, or to say for certain that it was caused by gender discrimination, rather than other conditions in the economy."). On this basis, the *Main Line* court held that the Board of Education had failed to demonstrate the "exceedingly persuasive justification" necessary to justify a gender-conscious classification. *Id.* at 1364. It is also important to note that the district court, interpreting the "philosophy" of *Croson,* held that the same intermediate scrutiny applied whether the legislative purpose behind the set-aside program was "benign or malignant." *Id.* at 1363.

## IV. Analysis

### A. Standing

The defendants contend that plaintiff, due to its status as a *prime* contractor, has no standing to dispute the state or federal D/W/MBE programs. Defendants maintain that the state and federal programs only differentiate between *subcontractors* employed by prime contractors. And, because the plaintiff is a *prime* contractor, defendants claim it has failed to allege that its *own* constitutional rights have been injured or threatened with injury. Defendants further assert that since all state-funded contracts on which the plaintiff was the low bidder have either been awarded to the plaintiff or completely withdrawn, plaintiff's claims with respect to the. *state* program are now moot.

The plaintiff argues that the scope of the injury upon which it seeks relief is not limited to whether it was awarded a particular contract. Rather, plaintiff maintains that the requirement that it participate in the program, along with the enforcement efforts taken by the Department of Transportation, present a complete and justiciable constitutional injury. Plaintiff cites the "threatening" enforcement letters, the potential loss of bid deposits, the Contract Review Unit meetings in which plaintiff felt compelled to employ counsel, the subcontracting of work to D/W/MBE's which plaintiff otherwise would have done itself, and the accompanying monetary expense, as examples of concrete injury stemming directly from the allegedly unconstitutional set-aside programs. It is also important to note that the plaintiff, whose entire business is the performance of state highway construction projects, seeks to enjoin *future* enforcement efforts.

The doctrine of standing was recently summarized by the Second Circuit in *In re U.S. Catholic Conference (USCC),* where the court stated:

> [T]he Supreme Court [has] made clear that standing is not merely a prudential inquiry into whether a court should exercise jurisdiction, but is rooted in Article III's "case" or "controversy" requirement and reflects separation of powers principles.... Thus, when a plaintiff lacks standing to bring suit, a court has no subject matter jurisdiction over the case. Deceptively simple to state, standing entails a complex three pronged inquiry. First, plaintiffs must show that they have suffered an injury in fact that is both concrete in nature and particularized to them.... Second, the injury must be fairly traceable to defendant's conduct.... Third, the injury must be redressable by removal of defendants' conduct.... The second and third prongs—traceability and redressability—often dovetail; essentially both seek a causal nexus between the plaintiff's injury and the defendant's assertedly unlawful act.

885 F.2d 1020, 1023–24 (2nd Cir.1989), *cert. denied* —— U.S. ——, 110 S.Ct. 1946, 109 L.Ed.2d 309 (1990). For purposes of conducting a standing analysis at this stage of the litigation the court must assume that the challenged programs operate to violate the Equal Protection Clause and accept the material allegations of plaintiff's complaint. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

Under the three-pronged analysis summarized in *In re U.S. Catholic Conference (USCC)*, it is clear that the plaintiff has made sufficient allegations to establish standing. The plaintiff asserts that it has (1) been required to participate in an unconstitutional program, (2) received letters from State DOT officials threatening sanctions for failure to comply with an unconstitutional program, and (3) incurred monetary losses due to the State DOT's current enforcement of the D/W/MBE programs. If these allegations are true it is apparent that plaintiff has suffered both actual and threatened injury which constitutes an "injury in fact that is both concrete in nature and particularized to [it]." *Catholic Conference*, 885 F.2d at 1023–24. Therefore, the first prong of the three part test is satisfied. Secondly, the plaintiff's alleged injury is fairly traceable to the defendants—who are the state officials responsible for the administration and enforcement of the challenged programs. And, finally, it is clear that if the defendants stopped enforcing the dictates of the D/W/MBE program, the injury would, at least in part, be redressed. Thus, the second and third prongs of the *Catholic Conference* test are satisfied. This court finds that the plaintiff has standing to challenge both the state and federal D/W/MBE programs.[20]

**B. Preliminary Injunction**

(i) *Standard for Preliminary Relief.* The standard in the Second Circuit for the issuance of a preliminary injunction is well settled. "The party seeking the injunction must show a risk of irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make a fair ground for litigation and a balance of hardships tipping in the movant's favor." *Johnson v. Kay*, 860 F.2d 529, 540 (2nd Cir.1988). To show a likelihood of success on the merits the movant "need only make a showing that the probability of his prevailing is better than fifty percent." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2nd Cir.1985).

However, other factors have been considered by courts which may operate to increase the burden upon a party seeking preliminary relief. For example, where the grant of injunctive relief will change the *status quo ante*—that is, an injunction will change the positions of the parties as it existed prior to the grant—the "injunction is often deemed mandatory, rather than prohibitory, and a greater showing is required of the moving party." *Id.* The same is generally true of situations where injunctive relief will provide the movant with essentially all the relief he seeks, *see e.g., Johnson v. Kay*, 860 F.2d at 540–41; *Eng v. Smith*, 849 F.2d 80, 82 (2nd Cir. 1988), or where an injunction will adversely impact upon the public interest. *Yakus v. United States*, 321 U.S. 414, 440–41, 64 S.Ct. 660, 674–75, 88 L.Ed. 834 (1944); *Union Carbide Agr. Products Co., Inc. v. Costle*, 632 F.2d 1014, 1017–18 (2nd Cir. 1980), *cert denied*, 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981); *Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2nd Cir.1989). It is clear that the D/W/MBE programs were enacted by the Congress and the New York State Legislature to serve the public interest. These programs will surely be adversely impacted should this court enjoin their operation. Thus, the plaintiff's burden on this motion for a preliminary injunction is to "show a *substantial* likelihood of success on the merits, i.e., that their cause is considerably more likely to succeed than fail (together, of course, with the requisite irreparable injury)." *Abdul Wali v. Coughlin*, 754 F.2d at 1026 (emphasis added); *see also Johnson v. Kay*, 860 F.2d at 540.

(ii) *Irreparable Injury.* "Irreparable injury means injury for which a monetary award cannot be adequate compensation and that where money damages is ade-

---

**20.** Though the portion of plaintiff's complaint which seeks the award of certain state-funded contracts has been made moot by the subsequent actions of the state, the plaintiff's claims concerning the enforcement procedures employed by the state, as well as the claim for prospective injunctive relief, are still before this court. Therefore the plaintiff's constitutional challenge to the state W/MBE program is not moot.

quate compensation a preliminary injunction will not issue." *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2nd Cir.1979). " 'When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.' " *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2nd Cir.1984) (Eighth Amendment) (quoting Wright & Miller, *Federal Practice and Procedure*, § 2948 at 440 (1973)); *see e.g., Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976) (First Amendment free speech); *Parents' Ass'n of P.S. 16 v. Quinones*, 803 F.2d 1235, 1242 (2nd Cir.1986) (Establishment Clause). In this motion the plaintiff is asserting that the State DOT's enforcement of the state and federal D/W/MBE program violates its Fourteenth Amendment right to equal protection; therefore, an alleged deprivation of a constitutional right is involved. The action has been brought, pursuant to 42 U.S.C. § 1983, against the Governor of the State of New York and the Commissioner of the New York Department of Transportation in their official capacities. Monetary compensation is thus not available to the plaintiff because "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dept. of State Police*, ⸺ U.S. ⸺, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989).[21]

(iii) *Qualified Immunity*. The plaintiff has, however, amended the complaint to add claims against Commissioner White, Darrell Harp, Kenneth Shiatte and Steven Lewis in their individual capacities.[22] Where a § 1983 plaintiff is not seeking a monetary award out of state funds, but rather, seeks a monetary award from a state official in his individual capacity—which can be executed only against the official's personal assets—the Eleventh Amendment is no bar. *Kentucky v. Graham*, 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105–06, 87 L.Ed.2d 114 (1985). *Dwyer v. Regan*, 777 F.2d 825, 835–36 (2nd Cir.1985). Along this line, it could be argued that the addition of the claims against the state officials makes money damages available to compensate the plaintiff for any loss and, therefore, the alleged injury suffered by the plaintiffs cannot be termed "irreparable." Indeed, the Second Circuit has held that a state official is "not protected from personal liability by the State's immunity under the eleventh amendment" even though the state official was "merely carrying out a policy of the State." *Farid v. Smith*, 850 F.2d 917, 921 (2nd Cir.1988). However, it is apparent that the alleged injury would still constitute irreparable harm. As the court stated in *Farid:*

> [I]n most instances an official who complies with an unconstitutional state law will be protected from personal liability by an applicable personal defense, such as absolute or qualified immunity or lack of personal involvement. For example, the defense of qualified immunity may shield a state official who acts under the authority of an unconstitutional state law; in most instances, compliance with state law is unlikely to violate clearly established federal law, since most state laws are not patently unconstitutional.

*Michigan Dept. of State Police*, 109 S.Ct. at 2312. The *Will* decision does not have any effect on the ability of a § 1983 plaintiff to sue state officials in their official capacity for prospective injunctive relief. *Id.* at 2311 n. 10 ("Of course a State official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 'because official capacity actions for prospective relief are not treated as actions against the State.' *Kentucky v. Graham*, 473 U.S., at 167, n. 14, 105 S.Ct., at 3106, n. 14.")

**21.** The plaintiff claims that an award of monetary compensation from the defendants is not available in federal court due to the operation of the Eleventh Amendment, *see e.g., Quern v. Jordan*, 440 U.S. 332, 338–45, 99 S.Ct. 1139, 1143–47, 59 L.Ed.2d 358 (1979), and, therefore, that the damages it has allegedly incurred are irreparable. The defendants' response was that monetary relief was available because the plaintiff could bring a § 1983 action in *state* court and not be barred by the constraints of the Eleventh Amendment. However, the Supreme Court has recently held that monetary relief is not available from a state or its officials acting in their official capacities because they are not "persons" within the meaning of § 1983. *Will v.*

**22.** The original complaint only sought damages against Governor Cuomo and Commissioner White in their official capacities.

*Id.* at 923. The probable applicability of the defense of qualified immunity to the personal-capacity claims alleged in this suit makes the recovery of monetary compensation by the plaintiff unlikely. *See e.g., Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987); *Robinson v. Via,* 821 F.2d 913, 920–21 (2nd Cir.1987). Therefore, the injury allegedly suffered by the plaintiff is irreparable for purposes of this motion. This is particularly so in light of the fact that this is a constitutional claim. *See Mitchell v. Cuomo,* 748 F.2d at 806.

## C. The Merits of the State W/MBE Program

■ The first step in determining whether the State W/MBE program is constitutional is to review the factual predicate upon which the race- and gender-conscious program was based. To pass constitutional muster the state must ultimately be able to demonstrate a compelling interest in the race-conscious aspects of the program as outlined in the *Croson* decision, and an "exceedingly persuasive justification" or "important governmental objective" in the gender-conscious aspect of the program. Should the State of New York be able to provide the court with such a factual predicate, it would still have to demonstrate that the race-conscious aspect of the program was "narrowly tailored" to achieve the state's compelling objective and that the gender-conscious aspect of the program was "substantially related" to the important governmental objectives. As discussed above, for plaintiff to be successful on this motion for a preliminary injunction the court must be convinced that the plaintiff has a substantial likelihood of success on the merits and that the other prerequisites to the issuance of a preliminary injunction have been satisfied.

### (i) *Justification for the New York State W/MBE Program*

The legislative declaration which accompanies the passage of Article 15–A of the New York Executive Law is fairly brief; it states in relevant part:

It is hereby found and declared that it has been and remains the policy of the state of New York to promote equal opportunity in employment for all persons, without discrimination on account of race, creed, color, national origin, sex, age, disability or marital status, to promote equality of economic opportunity for minority group members and women, and business enterprises owned by them, and to eradicate through effective programs the barriers that have unreasonably impaired access by minority and women-owned business enterprises to state contracting opportunities.

For purposes of addressing these findings, therefore, it is necessary and proper that article fifteen–A of the executive law, concerning participation by minority group members and women with respect to state contracts, be enacted.

1988 Session Laws, Ch. 261 § 62. The Executive Memorandum issued by the Governor when signing Chapter 261 (codified at Article 15–A of the N.Y. Executive Law) states in applicable part:

The provisions of this bill that establish a comprehensive, state-wide program to ensure that minority group members and women and business enterprises owned by them enjoy opportunities to benefit from state procurement and construction contracts represent an historic and unparalleled achievement in New York State. While we have made some progress by our recent efforts to advance and promote participation by minority and women businesses in our state contracting processes, these efforts have been based on piecemeal statutory authority and a resulting multiplicity of administrative regulation.

A significant achievement of this bill lies in its comprehensive and unifying effect. For the first time in New York oversight responsibility for the State's efforts will be centralized in a new state office. The office will certify businesses as owned and operated by minority group members and women, and will assist agencies in implementing their specific responsibilities to increase state contracting opportunities for minority and

women businesses and to encourage good faith efforts by state contractors to increase employment of minority group members and women and the number of subcontracting opportunities for minority and women businesses.

*McKinney's Session Laws of New York,* Vol. 2 at 2267 (1988). It is significant that neither of these statements refer to findings of discrimination in the construction industry or recite a legislative intent to remedy identified findings of past discrimination.

The defendants have submitted a number of affidavits and reports concerning the basis for the State W/MBE program. Horace Flowers, Director of the State DOT's Office of Equal Opportunity Development and Compliance, has submitted an affidavit which provides information concerning the background for the state program. Flowers asserts that in his position he has become familiar with the problems faced by W/MBE's in obtaining work. He is also responsible for compiling statistics regarding the participation of W/MBE's on both state and federally funded projects. May 3, 1989, Affid. of Flowers, par. 22.

Flowers asserts that he has frequently received complaints from W/MBE's that discrimination has kept them from gaining employment in the construction industry. These complaints, according to Flowers, are usually oral. No individual examples of the cited discrimination were provided to the court. Flowers claims that discrimination prevents minority- and women-owned businesses from receiving subcontracts and operates as a barrier to women and minorities who seek access to entry level training and union positions. Without this assistance at the entry level, it is asserted, the members of these groups find it difficult to develop into subcontractors or prime contractors. Flowers further asserts that W/MBE's are generally excluded from participation in construction industry associations—a factor which he maintains injures the W/MBE's ability to obtain subcontracts, supplies, relaxed insurance and bonding contracts, and capital from lending institutions. Flowers believes that discrimination on the part of the construction in-

dustry frequently results in W/MBE's receiving late payments, inaccurate job descriptions and schedules, and untimely provision of supplies. The State DOT's dealings with contractors who engage in such practices has, Flowers maintains, perpetuated the discrimination. *Id.* at pars. 22–27 and Exhibit D.

Flowers cites some statistics to support his accusations. In 1988, the year that Article 15–A was enacted, the New York State Chapter of the American General Contractors Association had 502 members of which only 34 were women- or minority-owned businesses. Moreover, the New York State Asphalt Pavement Association had 92 member companies in 1988, none of which were owned by women or minority group members. *Id.* at par. 25. No specific instance of discriminatory exclusion from these associations was cited by Flowers. An additional statistic cited by Flowers concerns *prime* contractors. Out of the 2090 prime contracts let by the State DOT from January 1, 1984, to July 12, 1988, only 1.72% were awarded to W/MBE's— amounting to 1.36% of all monies spent. Flowers asserts that this participation level is low relative to the 750 certified W/MBE firms which have been "certified" by the State DOT. *Id.* at pars. 25, 28, 30. According to Flowers, these statistics have been submitted as parts of reports to the Governor's office and the state legislature. Flowers also asserts that he regularly testifies on these matters before legislative subcommittees and at legislative conferences. *Id.* at pars. 28, 31.

The defendants have also provided the court with the affidavit of Howard Sheffey, who has served as Director of the DOT's Transportation Affirmative Action Programs Office. Sheffey asserts that historical and statistical information concerning the participation of W/MBE's in state and federally funded projects demonstrates that most prime contractors will not subcontract to W/MBE's unless they are required to do so. May 3, 1989, Affid. of Sheffey, par. 3.

Sheffey believes that when he first joined the State DOT in 1977 the participation rate of MBE's as subcontractors was less than ½%. *Id.* at par. 4. As of 1980 the State DOT, in response to criticism from the Federal Highway Administration and newly enacted federal laws and regulations, enacted a 2% participation goal for both WBE's and MBE's on federally funded projects. Sheffey believes that the W/MBE participation level on state-funded contracts in 1980 was less than 1%. *Id.* at par. 7. It was at that time that the State DOT started placing W/MBE participation goals on state-funded projects. The following chart summarizes the statistics presented by Sheffey:

| | % Dollar Value Awarded to MBE | % Dollar Value Awarded to WBE |
|---|---|---|
| 1981–82 Federally Funded Contracts | 9.1% | 3.5% |
| 1981–82 State Funded Contracts | 4.6% | 2.6% |
| 1982–83 Federally Funded Contracts | 12.9% | 4.7% |
| 1982–83 State Funded Contracts | 8.1% | 5.5% |
| 1983–84 Federally Funded Contracts | 9.7% | 3.1% |
| 1983–84 State Funded Contracts | 10.8% | 4.0% |

*See id.* at pars. 7–15 and Exhibits B and C. Sheffey asserts that the "low" participation levels of WBE's and MBE's is attributable to "pervasive discrimination" in the construction industry. Sheffey bases this opinion on his frequent communications with the W/MBE community and attendance at the New York State Legislature's Black and Puerto Rican Caucus Meetings. However, no specific examples of discriminatory conduct have been provided to the court by Sheffey. He states that W/MBE's claim to be excluded from major contracting associations which leads to a lack of contacts for jobs and financing, and that women and minorities also complained about exclusion from training programs and unions. Furthermore, Sheffey maintains that prime contractors frequently fail to respond to their bids; supply fraudulent information; fail to provide work schedules in advance of job performance; and often fail to provide necessary supplies and equipment. *Id.* at pars 17–18. Sheffey asserts that he frequently shared his views concerning discrimination within the construction industry with members of the state legislature. *Id.* at par. 20.

Attached to the May 2, 1989, affidavit of Marla Tepper are a number of exhibits which the defendants claim demonstrate that the state legislature had a firm basis for believing there to be discrimination in the construction industry prior to the enactment of Article 15–A. These exhibits include a number of agency and task force reports regarding the participation of WBE's and MBE's on state contracts. May 2, 1989, Affid. of Tepper, pars. 4, 5, and Exhibits A–F.

Exhibit A to the Tepper Affidavit is a 1982 report of the State of New York Office of General Services which is entitled "New York State Office of General Services Minority Business Procurement & Compliance Annual Activity Report." This report discusses the Office of General Service's attempts to comply with Executive Order No. 117. The Executive Order, which was issued on December 9, 1981, directed all state agencies to make concerted efforts to increase opportunities for minority business participation in state contracts. While this report discusses state agency implementation of the Governor's

Executive Order, no relevant statistical information concerning prior discrimination in the transportation construction industry is provided to the court. The report does show a fairly low level of participation of MBE's in state contracts generally, but no information is provided which shows that the participation of MBE's is low relative to the number of MBE's ready and able to perform the contracts. This is the analysis required by *Croson*. Moreover, there are no individual examples of discrimination on the part of the state or the construction industry contained in this report. Finally, nothing is included in this report which informs the court about prior discrimination against women.

Exhibit B contains portions of the Annual Reports of the Governor's Office of Contract Compliance and Minority & Women–Owned Business Enterprise for 1984–1986. The portions of these reports which are attached describe compliance with a minority set-aside program established by Executive Order 21, but it provides the court with no information which justifies the enactment of the set-aside program. Attached as Exhibit C is a report by the New York State Department of Commerce entitled "Women–Owned Businesses in New York State, 1982." The report provides statistics concerning the numbers and general type of women-owned businesses in New York. Though there are numerous statistics in this report which are gleaned from reports issued by the U.S. Bureau of the Census, there is no discussion of discrimination against women in New York's construction industry. The same deficiencies exist in Exhibit D, which is a report by the New York State Department of Economic Development entitled "Minority–Owned Businesses in New York State, 1982"; this report provides no information or analysis concerning discrimination in the New York State construction industry. Neither is there any information or analysis contained in the remaining reports which provides relevant information concerning discrimina-

tion in the New York construction industry. In short, these reports contain many figures but no specific information and analysis which is applicable to the issues presently before the court. Moreover, the defendants have not supplied the court with any assistance in interpreting these statistics in a way which makes discrimination apparent. In fact, these reports barely discuss the problem of discrimination at all.

Defendants further assert, as a ground for the denial of plaintiff's motion for a preliminary injunction, that they will be able to develop a post-enactment record concerning discrimination in the construction industry which will provide the court with the "compelling interest" necessary to justify the race-conscious legislation and the "exceedingly persuasive justification" necessary to justify gender-conscious legislation. Defendants plan to accomplish this task by: taking depositions of members of W/MBE's who have experienced discrimination in the construction industry; investigating the practices of prime contractors with respect to their utilization of W/MBE's on projects which are not funded with state or federal monies; reviewing the practices of construction craft unions and other entry level positions within the construction industry; and by developing statistical information concerning the participation level of W/MBE's in construction industry trade associations. Attached to the Tepper affidavit as examples of this post-enactment fact finding is an affidavit of the president of a minority-owned business which alleges discriminatory conduct on the part of prime contractors and a letter describing discriminatory practices allegedly engaged in by a construction craft union. *Id.* pars. 7–8 and Exhibits G and H. However, at least with respect to the race-conscious aspect of the state statute and regulations, the main focus of this court's inquiry must be the legislative findings and informational backdrop which was available to the state legislature *prior* to the enactment of Article 15–A.[23]

---

**23.** While *Croson* did not completely bar courts from reviewing evidence of discrimination garnered after the enactment of the race-conscious

legislation, the Court cited with favor the position taken by Justice Powell in *Bakke* that the government only has a compelling interest in

**(ii)** *Analysis of Justification for Race–Conscious·Aspect of State W/MBE Program.*

The information put forward by the defendants to support the race-conscious aspect of Article 15–A and the regulations promulgated thereunder is too generalized and conclusory to meet the stringent requirements of *Croson.* The court is left almost completely unaware of any identified instances of racial discrimination in New York's construction industry. It is not known how many complaints were made, the race or national origin of those making complaints, the number of MBE's available to undertake public contracting work, the number of violations of state and federal anti-discrimination laws, or whether specific evidence was ever presented to the legislature or the State DOT before the adoption of the legislation and accompanying regulations. As noted in this court's review of the *Croson* decision, it is this sort of information which is necessary for the court to determine whether the state legislature had a " 'strong basis in evidence for its conclusion that [race-conscious] remedial action was necessary.' " *Croson,* 109 S.Ct. at 724.

The affidavits of Flowers and Sheffey do not contain any specific examples of discriminatory conduct against persons on account of race. Even if the New York Legislature was fully aware of the statements made in the affidavits, these "generalized assertion[s] that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Croson* 109 S.Ct. at 723.

The brief legislative history of the enactment of Article 15–A states that the legislative purpose is to serve equality of opportunity and to assist in the removal of barriers which have hindered minorities from participating in state contracts—clearly a beneficial purpose. However, the legislative history provides no evidence that the state legislature made identified findings of discriminatory conduct by the State of New York or by entities who participated in state contracts. Moreover, there is nothing in the legislative history presented to this court which is concerned with discrimination in the construction industry. As stated by the Court in *Croson* the "mere recitation of a 'benign' or legitimate purpose for a racial classification, is entitled to little or no weight." *Id.*

It is significant that both Article 15–A and the regulations promulgated thereunder apply to *all* state contracts and contracting agencies. This broad brush legislative and regulatory approach, in particular the directive that MBE's be provided with their "fair share" of state contracts, N.Y.Exec. Law §§ 311(3)(a), 313(1), appears to be aimed more at racial balancing than at rectifying the effects of identified discrimination. This type of "overinclusiveness" was found by the *Croson* Court to "impugn[ ] the ... claim of remedial motivation." *Id.* at 728.

The most convincing evidence of racial discrimination presented by the defendants were the statistics concerning the low level of MBE participation on state-funded contracts. However, the *Croson* Court found such statistics to be of little value in demonstrating a compelling interest in race-conscious legislation. In *Croson,* the City Council of Richmond relied on the fact that minorities received only .67% of the prime contracts on city construction contracts while they comprised nearly 50% of the population as evidence of discrimination. The Supreme Court, however, found that the relevant statistical comparison was not

---

favoring one race over another if "judicial, legislative, or administrative findings of constitutional or statutory violations" have been made. *Id.* 109 S.Ct. at 723 (quoting *Bakke,* 438 U.S. at 308–09, 98 S.Ct. at 2757–58). Findings of "identified discrimination" were held to be necessary to both justify the race-conscious program and to assist the state or locality in narrowly tailoring the remedy to the identified discrimination.

*Id.* 109 S.Ct. at 730 (Findings of identified discrimination are "necessary to define both the scope of the injury and the extent of the remedy necessary to cure its effects."). Moreover, the Court also·stated that States and their subdivisions· "must identify [the] discrimination ... with some specificity *before* they may use race-conscious relief." *Id.* at 727.

a comparison of the percentage of contracts awarded to minority firms relative to the racial composition of the general population. Rather, "the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task" as compared to the number of contracts awarded to the qualified minority firms. *Id.* at 725. There is no evidence before the court which provides information of this sort. Along these same lines, the defendants' statements concerning the low number of MBE members in contractor associations, standing alone, was not viewed by the *Croson* Court as relevant evidence of discrimination. There must be a comparison to the *eligible* MBE's. *Id.* at 726.

### (iii) *Analysis of Justification for Gender–Conscious Aspect of State W/MBE Program.*

■ The information put forward by the defendants to show an "exceedingly persuasive justification" or "important governmental objective" for the gender-conscious aspect of the State W/MBE program is similarly deficient. The legislative history which accompanied the passage of the State W/MBE program evidences an intent to provide women with their fair share of contracts (simple gender balancing) as much as it shows an intent to cure the effects of past discrimination. No specific examples of gender discrimination in the New York construction industry, which were available to the state legislature at the time of the enactment of Article 15–A, have been provided to the court. Defendants did not provide information concerning: the number of women-owned businesses eligible and able to work on construction contracts; violations of state and federal anti-discrimination laws by firms in the construction industry; or national findings of discrimination toward women from which the court might be able to infer the existence of local discrimination. Moreover, much of the information which was provided to the court, particularly the statistics contained in the numerous reports, is old. The bulk of the statistics are from 1982; Article 15–A, and the regulations promul-

gated thereunder, were enacted in 1988. The court agrees with the defendant that the state's purported goal of rectifying past discrimination against women in the construction industry is an important governmental objective, which, if properly supported by substantial evidence, would justify the enactment of gender-conscious legislation. However, the defendants have supplied the court with scant evidence to support the State W/MBE program. The court is simply unable to find, on the evidence before it, that the "members of the gender benefited by the classification actually suffer a disadvantage related to the classification." *Mississippi University*, 458 U.S. at 728, 102 S.Ct. at 3338.

### (iv) *Preliminary Injunction*

The court finds that defendants have failed to demonstrate anything resembling a compelling interest in the race-conscious aspects of Article 15–A and the regulations promulgated thereunder or an exceedingly persuasive justification for the gender-conscious aspects of that program. The failure of proof makes it "almost impossible," *Croson*, 109 S.Ct. at 728, to assess whether the race-conscious aspect of the State W/MBE program is narrowly tailored or whether the gender-conscious portion of the program is substantially related to the important governmental objectives. The court simply does not know the scope of the discrimination which the State of New York was seeking to remedy. Therefore, the court is not able to determine whether the remedial provisions of the W/MBE program were appropriately tailored to the governmental objective. Rather than engage in speculation, the court will defer to a later date any discussion of the second prong of equal protection analysis. In any event, this court finds that the plaintiff has a substantial likelihood of success on the merits of its claim. Moreover, as discussed above, the court finds that the plaintiff has shown the requisite irreparable injury sufficient for the issuance of a preliminary injunction.

## D. Merits of the Federal DBE Program

■ Even though the evidence provided by the defendants does not provide sufficient justification for the Federal DBE program described above, this court will not issue a preliminary injunction barring the State DOT from enforcing the provisions of STURAA and the regulations promulgated thereunder. This court's initial investigation into the merits of the federal program and its administration by the State DOT reveals that the plaintiff does not have a substantial likelihood of success on the merits of its equal protection challenge.

The current federal DBE program is authorized by section 106(c) of STURAA. This program is modeled upon the DBE set-aside program contained in section 105(f) of the STAA which was, in turn, modeled after section 103(f)(2) of the Public Works Employment Act of 1977 ("PWEA"). *See* Senate Report (Environment and Public Works Committee) No. 100–4, 100th Cong., 1st Sess. (1987), U.S. Code Cong. & Admin. News Vol. 2 (1987) (Legislative History) page 76. The minority set-aside provisions of PWEA, along with the regulations promulgated thereunder, survived a facial constitutional challenge in *Fullilove.* The Supreme Court held that "Congress had abundant evidence from which it could conclude that minority businesses have been denied effective participation in public contracting opportunities by procurement practices that perpetuated the effects of prior discrimination." 448 U.S. at 477–78, 100 S.Ct. at 2774.

This court has concluded in previous a portion of this decision that nothing in *Croson* detracts from the continued validity of *Fullilove,* and therefore, *Fullilove* still sets the standard of judicial review of affirmative action programs which have received the approval of Congress. The relationship between the former and current federal DBE program is significant support for the position that the current program,

as administered by the State DOT, is constitutional. Moreover, Justice Burger's decision in *Fullilove* also undertook a detailed review of the regulations which implemented the congressionally authorized minority set-aside program. *Id.* at 468–72, 100 S.Ct. at 2769–71. The Chief Justice found that the "administrative approach [was] consistent with the legislative intention." *Id.* at 471, 100 S.Ct. at 2771. A review of the regulations described in *Fullilove* shows a strong relationship to those challenged in the present litigation.

When enacting section 106(c) of STURAA, which for the first time added WBE's as businesses which are rebuttably presumed to be disadvantaged, the Senate Committee stated that it had "considered extensive testimony and evidence on the bill's DBE provision, and has concluded that this provision is necessary to remedy the discrimination faced by socially and economically disadvantaged persons attempting to compete in the highway and mass transit construction industry." Senate Report (Environment and Public Works Committee) No. 100–4, 100th Cong., 1st Sess. (1987), *reprinted in* U.S.Code Cong. & Admin.News Vol. 2 (1987) (Legislative History) page 76. The Congress apparently engaged in hearings aimed at determining whether there was discrimination in the national construction industry—finding that such discrimination still exists. Given these findings, along with the fact that § 5 of the Fourteenth Amendment provides Congress with far broader powers to enact race and gender-conscious legislation, *see Fullilove,* 448 U.S. at 472, 483–484, 100 S.Ct. at 2271, 2777; *Croson,* 109 S.Ct. at 719, (section 5 of the Fourteenth Amendment " 'is a *positive* grant of legislative power authorizing *Congress* to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment' "), the federal program is likely to survive constitutional scrutiny.[24]

**24.** The Supreme Court's recent decision in *Metro Broadcasting, Inc. v. F.C.C.,* ——— U.S. ———, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), strongly supports this analysis. The *Metro Broadcasting* Court expressly rejected the application of the strict scrutiny standard to a program, administered by the Federal Communications Commission and approved by Congress, which promoted minority ownership of radio and television broadcast stations. The Court relied heavily on

■ The plaintiff has asserted that New York State's *implementation* of the federal program is not in compliance with the federal 10% goal because the State DOT has submitted a 17% goal for the participation of DBE's on federally funded projects. It is far from certain that plaintiff's position is correct. The express language of section 106(c) of STURAA states that "not *less* than 10% of the amounts [appropriated under the act are to be] expended with small business concerns owned and controlled by socially and economically disadvantaged individuals." (Emphasis added). Moreover, the conference committee report makes clear that Congress intended the 10% goal as a minimum and not a maximum. H.Conf.Rep. No. 100–17, 100th Cong., 1st Sess. (Joint Explanatory Statement of the Committee of Conference) (1987), U.S.Code Cong. & Admin. News Vol. 2 (1987) (Legislative History) page 132 ("Some states may wish to establish a DBE goal which exceeds the minimum goal set by this section, and they are permitted to do so."). Moreover, the Federal Highway Administration has apparently interpreted STURAA as permitting an upward deviation from the 10% goal because it has specifically approved the State DOT's 17% DBE participation goal. May 3, 1989 Affid. of Flowers, Exhibit A.

■ Plaintiff also makes the argument that *Fullilove* was somehow limited to the constitutionality of the federal legislation and was not concerned or did not speak to the state and local *implementation* of this program. Plaintiff further asserts that the State DOT has to engage in its own fact finding concerning discrimination against DBE's before it may enforce the federal program. Such does not appear to be the case. The *Fullilove* Court clearly understood that the federal DBE program would impact upon the state and local distribution of public works monies—holding that Congress had the authority to reach the practices of prime contractors on federally funded local construction projects. *Fullilove*, 448 U.S. at 475–76, 100 S.Ct. at 2773–74, ("Congress not only may induce voluntary action to assure compliance with existing federal statutory or constitutional anti-discrimination provisions, but also, where Congress has authority to declare certain conduct unlawful, it may as here, authorize and induce state action to avoid such conduct." *Id.* at 483–84, 100 S.Ct. at 2777); *see also Milwaukee County Pavers Ass'n v. Fiedler*, 710 F.Supp. 1532, 1545–46 (W.D. Wis.1989) ("If Congress can require states to comply with race-conscious requirements, state legislation enacted to create the means of fulfilling those requirements must also be permitted.").

The parties to the present motion have not placed before this court any significant information concerning the congressional justification for the enactment of section 106(c) of STURAA. However, at least one post-*Croson* court has examined the congressional findings underlying STAA and STURAA and found that "Congress had before it ample evidence of past discrimination in the construction trade and could constitutionally enact [these] race-conscious remedies and impose them on the states." *Milwaukee County Pavers Ass'n v. Fiedler*, 710 F.Supp. 1532, 1549 (W.D. Wis.1989). That same court undertook a comparison of the program under review in *Fullilove* and that set forth in STURAA and its implementing regulations—finding that STURAA was narrowly tailored in a manner sufficient to withstand constitutional scrutiny. *Id.* at 1549–50. Needless to say, if the race-conscious provisions of STURRA are able to survive a motion for a preliminary injunction, the gender-con-

---

*Fullilove* in recognizing Congress' special "institutional competence" to enact race-conscious remedial legislation. *Croson* was distinguished as being applicable only to state and local programs, and was read in a manner so as not to "undermine" *Fullilove*. The *Metro Broadcasting* Court held that "benign" racial classifications which have been approved by Congress will be upheld "to the extent that they serve important governmental objectives within the power of Congress and are substantially related to the achievement of those objectives." — U.S. at ——, 110 S.Ct. at 3009. The application of this intermediate level of scrutiny, as opposed to strict scrutiny, is far more likely to result in the program being upheld against a constitutional challenge.

scious aspects of the federal legislation and regulations, which are subject to a lesser degree of scrutiny, survive as well.

Finally, this court must note that an injunction against the federal program might be unduly prejudicial to the federal government's ability to intervene in this suit and offer evidence in support of the congressional enactment. This suit and the present motion for a preliminary injunction involve a constitutional attack on the state enforcement of a federal DBE program which is authorized by the express language of the Surface Transportation and Uniform Relocation Assistance Act of 1987, Section 106(c). As discussed above, the defendants have not attempted to supply the court with information to justify the Congressional enactment of this legislation, the regulations promulgated thereunder, or the specifics of the DBE set-aside requirements. Though the court was not informed by either party, it has come to the court's attention that the United States Attorney General has not been notified of what could be termed an implicit constitutional challenge to Section 106(c) of STURAA and given an opportunity to intervene as required by 28 U.S.C. § 2403(a).[25]

Under these circumstances, the failure to certify pursuant to 28 U.S.C. § 2403 may cause harm to the position of the United States for the simple reason that the current defendants have not actively defended the federal law from attack. The Second Circuit has indicated that when prejudice is caused to the position of the United States by the failure on the part of the court to certify the question, the court should not take any action to strike down the statute until proper certification has been made. *See e.g., Merrill v. Town of Addison,* 763 F.2d 80, 83 (2nd Cir.1985) (*"Absent* indication of harm, or prejudice to the government's opportunity to fully present its

views, belated certification, while not ideal, is sufficient to honor the purpose of section 2403." (emphasis added); *Wallach v. Lieberman,* 366 F.2d 254, 257–58 (2nd Cir. 1966) (There was no harm from the district court's failure to certify because the district court had upheld the federal statute against constitutional attack.).

## V. Conclusion

Plaintiff, Harrison and Burrowes Bridge Constructors, Inc., has satisfied the requirements for the issuance of a preliminary injunction barring the New York State Department of Transportation from engaging in the enforcement of the women and minority set-aside provisions of Article 15–A of New York Executive Law §§ 310–18, and the regulations promulgated thereunder. The plaintiff has established both irreparable injury and a likelihood of success on the merits as to its equal protection challenge to the *state* program. This injunction, however, only applies to the defendants' enforcement of the state program *as against the plaintiff* and only to the extent that plaintiff bids on state-funded transportation projects. The injunction is intentionally narrow in scope to protect the public interest involved in this major state program. Federal courts should be particularly cautious when enjoining state legislation prior to trial because the decision is being made on a less than complete factual record. *See e.g., Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 580 (2nd Cir.1989). Moreover, the plaintiff has not brought this suit on behalf of a class and has indicated on the record that it would be satisfied with limited relief, at least with respect to a preliminary injunction.

However, this court denies plaintiff's request for a preliminary injunction barring

---

**25.** Title 28 U.S.C. § 2403(a) states:

In any action, suit or proceeding in a court of the United States to which the United States or any agency, officer or employee thereof is not a party, wherein the constitutionality of any Act of Congress affecting the public interest is drawn in question, the court shall certify such fact to the Attorney General, and shall permit the United States to intervene for presentation

of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The United States shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality.

**1006**

the New York State Department of Transportation from enforcing the disadvantaged set-aside program established by Section 106(c) of the Surface Transportation and Uniform Relocation Assistance Act of 1987, and the regulations promulgated thereunder. The court is not satisfied that the plaintiff has shown a substantial likelihood of ultimately succeeding on the merits of its equal protection challenge to the federal program.

Accordingly, the plaintiff's motion for a preliminary injunction barring the defendants from enforcing the women and minority set-aside provisions of Article 15–A of New York Executive Law §§ 310–18, as against plaintiff Harrison and Burrowes Bridge Constructors, Inc., is GRANTED, and plaintiff's motion for a preliminary injunction barring the defendants from enforcing the disadvantaged set-aside provisions established by Section 106(c) of the Surface Transportation and Uniform Relocation Assistance Act of 1987 is DENIED.

IT IS SO ORDERED.